FILED

04/10/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0499

DA 16-0499

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 81

STATE OF MONTANA,

Plaintiff and Appellee,

v.

LAURA LEE NEVA,

Defendant and Appellant.

APPEAL FROM:     District Court of the Twenty-Second Judicial District,
In and For the County of Stillwater, Cause No. DC 15-23
Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Nick K. Brooke, Smith & Stephens, P.C., Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, J. Stuart Segrest, Assistant
Attorney General, Helena, Montana

Nancy Rohde, Stillwater County Attorney, Columbus, Montana

Submitted on Briefs:  March 7, 2018

Decided:  April 10, 2018

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Laura Neva appeals her conviction upon a *nolo contendere* plea for driving under the influence (DUI) in the Twenty-Second Judicial District, Stillwater County. We affirm, and address the following issue:

> *Did the officer unreasonably impede Neva's right to obtain an independent blood test?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On the evening of July 6, 2014, Montana Highway Patrol Trooper Zachary Grosfield responded to a low-speed, rear-end collision in Absarokee. Neva, driving a 1997 Ford pickup, had rear-ended an SUV stopped at a stop sign. The initial impact pushed the SUV forward, and Neva then accelerated, hitting the SUV a second time. While questioning her about the accident, Officer Grosfield detected that Neva smelled of alcohol, slurred some of her words, and exhibited reddening in her eyes. Grosfield administered a field sobriety test, on which Neva did "very poorly," though Neva stated she had a cow-roping injury that prevented her from properly performing the tests. The preliminary breath test indicated a .261 blood alcohol content. Neva seemed surprised, and requested to take it again. Grosfield placed Neva under arrest and informed her that another breath test would be administered on a different instrument at the Sheriff's office in Columbus.

¶3 On the drive to Columbus, Neva implied she had sued local law enforcement in the past, which resulted in four officers and a country attorney losing their jobs. Neva also told Grosfield that she had prevailed at the Montana Supreme Court twice in a case against

2

a former landlord. Upon arriving at the station, Grosfield asked another person at the station to keep an eye on things, given Neva's apparent interest in litigation.

¶4 At the station, Neva had difficulty providing a proper breath sample. Grosfield noticed that Neva was placing her tongue into the straw and blowing around it. Grosfield told Neva he knew she could provide a sufficient breath sample because she had already done so. To inspire Neva to provide a proper sample, Grosfield stated, "otherwise we gotta go down to the hospital and get a blood draw and that's way too much work." Grosfield then read Neva the implied consent advisory, including the notification of her right to an independent blood test. Several hours after the accident, and with much encouragement from Grosfield, two breath samples were obtained from Neva, including readings of .199 and .184.

¶5 Neva again expressed surprise at the results because she did not feel intoxicated. Grosfield explained that heavily intoxicated people often do not feel inebriated and began to read Neva her Miranda rights. Neva interrupted to ask, "can I get a blood test too?" Grosfield responded, "you can get a blood test," explaining it would be at her own expense and, "after we're finished here." Neva agreed to answer questions, but expressed continued interest in a blood test during the interview.

¶6 After the interview, Grosfield asked Neva if there was someone she could call to give her a ride to the hospital for the blood test. Neva asked Grosfield for a ride home, and Grosfield reminded Neva that she wanted a blood test and needed to go to the hospital first. Neva asked Grosfield to take her the hospital and then to her house. Grosfield explained

he did not have time to do that, but went to his car to retrieve Neva's phone so she could arrange transportation to the hospital. When Neva stated she would call the friend she was drinking with earlier, Grosfield advised that anyone who was transporting her needed to be sober. Grosfield allowed Neva to attempt to arrange a ride while he finalized paperwork related to Neva's DUI charge. Neva made three phone calls, but no one answered.

¶7 Grosfield informed Neva he would take her to her house, and that she could continue her efforts to arrange a ride for a blood test. He encouraged her to do it promptly, given the amount of time that had elapsed since the accident. Arriving at Neva's house, Grosfield provided Neva with citations for aggravated DUI and careless driving, as well as written warnings for Neva's failure to have proof of insurance and a vehicle registration in the vehicle, and to have her driver's license. Grosfield again encouraged Neva to call someone to take her to the hospital for a blood test.

¶8 Grosfield later testified that he did not have time to take Neva to the hospital and wait for the blood draw, which could take several hours, because he was the only trooper on duty that night in a three-county area, including Sweet Grass, Stillwater, and Carbon counties. He explained that he had been unable to respond to a rollover accident, and that there were fights at a barbeque competition in Absarokee. He testified that he could not safely release Neva from the station to walk the approximately 10 blocks to the hospital, nor could he drop her off at the hospital, because he believed she was "very intoxicated" and had no way to get home, which was about 10 miles away. In addition to his concern about her safety, Grosfield noted he was concerned about his and the hospital's liability if

4

he were to release Neva or leave her at the hospital, particularly if she tried to walk home along the highway. Grosfield testified that he was not sure if there was a city police officer or sheriff's deputy who could have taken Neva to the hospital and then home, but that he did not ask because it was a busy night and he prefers to handle his arrests to completion, rather than tying up another officer. Grosfield testified he thought it was likely that Neva would find someone to take her to the hospital, because she told him she had lived in the area many years and used to own a business there.

¶9 Neva filed a motion to dismiss the DUI charge in the Stillwater County Justice Court, arguing she had been deprived of her due process right to an independent blood test pursuant to § 61-8-405(2), MCA. The Justice Court held a hearing wherein Grosfield testified and portions of the investigation audio were played. The Justice Court held that Grosfield had no obligation to transport Neva for a blood test and did not unreasonably impede her ability to obtain a test by taking her home. A jury convicted Neva of DUI and careless driving.

¶10 Neva appealed to District Court, where she again moved to dismiss the DUI charge. A hearing was held wherein Grosfield again testified and audio from the investigation was played. The District Court denied the motion, finding Grosfield's testimony to be credible, and holding that he had not unreasonably impeded Neva's ability to obtain an independent test. Neva entered a no contest plea to DUI and careless driving, reserving the right to appeal the denial of her motion to dismiss.

## STANDARD OF REVIEW

¶11  We review *de novo* a district court's decision denying a criminal defendant's motion to dismiss.  *State v. Minkoff*, 2002 MT 29, ¶ 8, 308 Mont. 248, 42 P.3d 223 (citations omitted).

## DISCUSSION

¶12  *Did the officer unreasonably impede Neva's right to obtain an independent blood test?*

¶13  One accused of DUI "has a right to obtain a sobriety test independent of that offered by the arresting officer."  *State v. Swanson*, 222 Mont. 357, 360, 722 P.2d 1155, 1157 (1986); *City of Whitefish v. Pinson*, 271 Mont. 170, 172, 895 P.2d 610, 612 (1995) (citations omitted); *State v. Sidmore*, 286 Mont. 218, 233, 951 P.2d 558, 568 (1997) (citations omitted); *Minkoff*, ¶ 9 (citations omitted).  The accused must be informed of her right to obtain an independent test, and if she timely requests one, "the officer may not frustrate or impede the person's efforts to do so."  *Minkoff*, ¶¶ 9-10 (citations omitted).  At the same time, officers have no duty to affirmatively assist a person in obtaining an independent blood test.  *Minkoff*, ¶ 9 (citations omitted).  Consistent with our holdings, the Legislature has codified the process that is due with regard to an independent sobriety test:

> In addition to any test administered at the direction of a peace officer, *a person may request that an independent blood sample* be drawn by a physician or registered nurse for the purpose of determining any measured amount or detected presence of alcohol, drugs, or any combination of alcohol and drugs in the person. *The peace officer may not unreasonably impede the person's right to obtain an independent blood test.  The officer may but has no duty to transport the person to a medical facility or otherwise assist the person in obtaining the test*.  The cost of an independent blood test is the sole responsibility of the person requesting the test.  The failure or inability to

6

> obtain an independent test by a person does not preclude the admissibility in evidence of any test given at the direction of a peace officer.

Section 61-8-405(2), MCA (emphasis added).

¶14    Neva first argues, relying on *Swanson*, that not releasing her at the station and instead driving her home, ten miles from the hospital, was a deviation from standard procedure that frustrated her ability to obtain an independent blood test.  She argues that under standard police policy, she should have been released to walk the ten blocks to the hospital.  In *Swanson*, the police allowed the defendant to obtain an independent blood draw, and a vial marked "keep refrigerated" was given to the defendant.  *Swanson*, 222 Mont. at 361, 722 P.2d at 1158.  However, the officers took the vial from the defendant as part of the routine inventory booking search, and left the vial on the counter, where its evidentiary value spoiled.  *Swanson*, 222 Mont. at 361, 722 P.2d at 1158.  We held that this action interfered with Swanson's right to obtain exculpatory evidence, noting the police deviated from their own procedure of preserving evidence taken from a defendant.  *Swanson*, 222 Mont. at 361-62, 722 P.2d at 1158.

¶15    We first note that Neva never asked to be released so that she could walk to the hospital, but requested only that Grosfield drive her to the hospital, which, pursuant to § 61-8-405(2), MCA, he had no obligation to do.  Grosfield testified he was willing to release an intoxicated person at the station, but only if they had arranged for a ride home.  Thus, upon Neva's failure to obtain transportation, Grosfield's action in driving her home to ensure her safety, given her apparent state of intoxication, was not a departure from procedure that denied her due process.

7

¶16    Secondly, Neva argues that because Grosfield told her she could get a blood test, he had an obligation to take her to the hospital to get one. We have held that, if an officer promises to take a defendant for an independent blood draw, an obligation is created to follow through on that promise. *See Pinson*, 271 Mont. at 175, 895 P.2d at 613. Neva argues, "as in *Pinson*, Grosfield told Neva that she would be able to get the test," thus creating an obligation for Grosfield to transport her to the hospital. In *Pinson*, the defendant refused a breath test and instead asked for a blood test. *Pinson*, 271 Mont. at 173, 895 P.2d at 612. The arresting officer told Pinson, "[w]e'll go get blood in a little while," but never followed through on that promise, leaving Pinson in her cell. *Pinson*, 271 Mont. at 173, 895 P.2d at 612. We determined this violated Pinson's due process right to get an independent test. *Pinson*, 271 Mont. at 175, 895 P.2d at 613.

¶17    However, although Grosfield notified Neva that she had a right to an independent blood test, he did not promise to transport her to obtain the test, as in *Pinson*. Grosfield specifically told Neva that "you" can obtain a test "at your own expense." Neva's argument would create an obligation for law enforcement to transport a defendant for an independent test by merely notifying her of the right to get an independent test, which is inconsistent with § 61-8-405(2), MCA, and our precedent. Rather, this case is closer to *Sidmore*, where the officer provided Sidmore with a phone and phonebook to arrange an independent test, and told him that transportation would be provided for the test once Sidmore had arranged it. *Sidmore*, 286 Mont. at 237, 951 P.2d at 570. However, Sidmore failed to arrange for a

8

test, and we held that the officer did not impede the right to due process. *Sidmore*, 286 Mont. at 237, 951 P.2d at 570.[1]

¶18 Lastly, Neva argues, relying on *Minkoff*, that driving her home, ten miles away from the hospital, was an affirmative act that frustrated her ability to obtain a blood test. In *Minkoff*, the arresting officer informed Minkoff that he had a right to an independent blood test at his own expense. *Minkoff*, ¶ 3. When Minkoff asked an officer if he should get a blood test, the officer told Minkoff that his blood alcohol concentration would be higher on the blood test. *Minkoff*, ¶ 4. We held the statement unreasonably impeded Minkoff's due process rights, noting the officer's statements, "albeit well-intentioned, were affirmative acts which would frustrate, if not obliterate, the intention of any rational arrestee to obtain an independent blood test." *Minkoff*, ¶ 16. We concluded someone would rarely assert their right to an independent blood test after being advised it would show a higher concentration than the blood test. *Minkoff*, ¶ 16. Neva argues that Grosfield unreasonably impeded her ability to obtain a blood test by the well-intentioned but affirmative action of driving Neva to her home, leaving her in a place where she was unlikely to be able to obtain a test and, further, that his assessment of her state of intoxication and concern for her safety were "unsubstantiated" and "hypothetical."

¶19 *Minkoff* is clearly distinguishable because Grossfield did not discourage Neva from obtaining an independent test, as the officer did in *Minkoff*, but instead brought Neva's

---

[1] Neva suggests that *Sidmore was* overruled by *Minkoff*, an argument raised by the dissent and rejected by the majority in *Minkoff*.

9

phone to her and encouraged her multiple times to arrange transportation for a test. Further, Grosfield's concern for Neva's safety was credited by the District Court, which found credible Grosfield's testimony that Neva was "very intoxicated." Thus, it was reasonable for Grosfield to not release Neva ten miles from her home, in the middle of the night, with no way to get home. Whether or not Neva was prone to litigation, Grosfield, by taking her into custody, assumed a duty to protect her from harm. *See Nelson v. Driscoll*, 1999 MT 193, 295 Mont. 363, 983 P.2d 972.

¶20    Affirmed.


                                    /S/ JIM RICE


We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON